# Staunton

## Claude F. Finney, et al. v. Harley A. Hawkins.

September 7, 1949.

Record No. 3501.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Beecher E. Stallard, J. Albert Woll, Herbert S. Thatcher* and *James A. Glenn*, for the plaintiffs in error.

*F. Lee Ford*, for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

This writ of error challenges the constitutional validity of chapter 2, Acts of Assembly, Extra Session, 1947, page 12,[1] commonly called the "Right to Work Statute," which became effective April 30, 1947. It provides in substance that neither membership nor non-membership in a labor union shall be made a condition of employment; that a contract limiting employment to union members is against public policy; and that a person denied employment because he is either a member of a union or not a member of a union shall have a right of action for damages.

This action was brought pursuant to the provisions of this statute. The facts are not in dispute. Hawkins had been employed as a pressman in Brickey Print Shop, a partnership, in January, 1947. On July 31, 1947, after the effective date of the act, the partnership entered into a contract with Newport News Building and Construction Trades Council to print and publish a labor journal. One of the

[1] "Be it enacted by the General Assembly of Virginia:

"1. Section 1. It is hereby declared to be the public policy of Virginia that the right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization.

"Section 2. Any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be against public policy and an illegal combination or conspiracy.

"Section 3. No person shall be required by an employer to become or remain a member of any labor union or labor organization as a condition of employment or continuation of employment by such employer.

"Section 4. No person shall be required by any employer to abstain or

provisions of the contract was that the partnership would employ only union labor in its shop. In September, 1947, Finney, one of the partners, inquired of Hawkins whether he was a member of a labor union. Hawkins replied that he was not, whereupon Finney told him he would have to join a union because his printing contract required employment of union labor only. Hawkins refused to do so, stating that he had never belonged to a union and did not think it was necessary. For this refusal he was discharged and refused further employment until he joined a union. It is admitted that he was skillful in his trade and that his work was very satisfactory. Finney told him that he needed him but would not allow him to work unless he joined a union. He did join later and was given back his job. Afterwards he went to work for another employer and then brought this action in which he has recovered a judgment against the partnership and the Trades Council for $330 for damages sustained by reason of being out of employment for a period of about four weeks.

The defense made to the action in the trial court was, and the reason assigned for reversal of the judgment here is, that the statute is unconstitutional because it violates the First and Fourteenth Amendments of the Federal Constitution, as well as sections 1, 11 and 12 of the Virginia Constitution, guaranteeing to the defendants and others freedom

refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment.

"Section 5. No employer shall require any person, as a condition of employment or continuation of employment, to pay any dues, fees or other charges of any kind to any labor union or labor organization.

"Section 6. Any person who may be denied employment or be deprived of continuation of his employment in violation of sections three, four or five or of one or more of such sections, shall be entitled to recover from such employer and from any other person, firm, corporation or association acting in concert with him by appropriate action in the courts of this Commonwealth such damages as he may have sustained by reason of such denial or deprivation of employment.

"Section 7. The provisions of this act shall not apply to any lawful contract in force on the effective date hereof but they shall apply in all respects to contracts entered into thereafter and to any renewal or extension of an existing contract."

Section 8. (Severability clause).

of assembly and speech, freedom of contract, equal protection of the law and due process of law.

■ Since this writ of error was granted, the Supreme Court of the United States has rejected as invalid the contention that laws having the purpose and effect of this statute infringe any provision of the Federal Constitution, admittedly settling that question in this case. *Lincoln Federal Labor Union* v. *Northwestern Iron, etc., Co.* and *Whitaker* v. *North Carolina*, (1 opinion), 335 U. S. 525, 69 S. Ct. 251, 93 L. ed. 201; *American Federation of Labor* v. *American Sash, etc., Co.*, 335 U. S. 538, 69 S. Ct. 258, 93 L. ed. 209.

In the first-named case, as the court stated, a North Carolina statute and a Nebraska constitutional amendment provided that no person in those States should be denied an opportunity to obtain or retain employment because he is or is not a member of a labor organization, and forbade employers to enter into contracts excluding persons from employment on either of those grounds. The North Carolina statute attacked in the *Whitaker Case, supra*, is practically identical with the Virginia statute. See *State* v. *Whitaker*, 228 N. C. 352, 45 S. E. (2d) 860.

In rejecting the claim that the North Carolina statute and the Nebraska constitutional amendment violated the First Amendment, the Supreme Court said: "Nothing in the language of the laws indicates a purpose to prohibit speech, assembly, or petition. Precisely what these state laws do is to forbid employers acting alone or in concert with labor organizations deliberately to restrict employment to none but union members.

"It is difficult to see how enforcement of this state policy could infringe the freedom of speech of anyone, or deny to anyone the right to assemble or to petition for a redress of grievances. * * * There cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their own working standards, a further constitutional right to drive from remunerative employment all

other persons who will not or can not, participate in union assemblies. * * * " 69 S. Ct. at p. 254.

In sustaining the said statute and constitutional amendment against the charge that they violated the equal protection clause of the Fourteenth Amendment, the court pointed out that these laws in fact command equal employment opportunities for both union and non-union workers, and that it was precisely for that reason that the appellants argued that their constitutional rights of assembly and due process had been infringed, because they claimed the Federal Constitution guarantees greater employment rights to union than to non-union members,—doubtless one of the "rather startling ideas" referred to by that court as having been advanced to support some of appellants' contentions.

In holding that these State laws do not violate the due process clause of the Fourteenth Amendment by forbidding contracts obligating the employer to refuse to hire or retain non-union workers, the court said that such laws in fact do no more than provide a method to aid the enforcement of the heart of the laws, which was their command that employers must not discriminate against either union or non-union members because they are such; and that "if the states have constitutional power to ban such discrimination by law, they also have power to ban contracts which if performed would bring about the prohibited discrimination." 69 S. Ct. at p. 255.

The court then reviewed its former decisions to establish that it had consciously returned closer to the earlier constitutional principle "that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law;" and that "under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they

regard as offensive to the public welfare." 69 S. Ct. at p. 257.

Answering the claim of appellants that while the Constitution affords protection for union members against discrimination, nevertheless the same Constitution forbids a state from providing the same protection for non-union members, the court concluded: "Just as we have held that the due process clause erects no obstacle to block legislative protection of union members, we now hold that legislative protection can be afforded non-union workers." 69 S. Ct. at p. 257.

The same arguments that were made against the North Carolina statute and the Nebraska constitutional amendment are made against the Virginia statute in the briefs for appellants filed before us. The answers to these arguments given by the Supreme Court with respect to the Federal Constitution are equally clear answers with respect to the Virginia Constitution. As we said in *Reynolds* v. *Milk Comm.*, 163 Va. 957, 963, 179 S. E. 507, 509, "the challenged provisions of the Virginia and Federal Constitutions are quite similar. Both guarantee to the citizen certain inherent rights, and, in our opinion, if the act * * does not offend the Federal Constitution, then it will not offend the Virginia Constitution."

Clearly the statute does not in any manner violate section 1 of the Virginia Constitution, which asserts the inherent right of all men to enjoy life and liberty, to acquire property and to pursue and obtain happiness and safety. In *Young* v. *Commonwealth*, 101 Va. 853, 45 S. E. 327, it was said that the liberty so referred to includes the right of the citizen to be free in the enjoyment of all his faculties and to use them in all lawful ways, to live and work where he will, and to earn his livelihood by any lawful calling. So far from violating this section, which is the first section of our Bill of Rights, the statute here called in question is in keeping with and in aid of both the letter and the spirit of that section, preserving the liberty of men to work and earn their living without having that inherent right limited

or destroyed by the condition of belonging or not belonging to some particular labor organization.

Neither section 11 of the Constitution, which contains our State due process of law provision, nor section 12, protecting free speech, is infringed by the statute in question, for the same reasons that it does not collide with the similar provisions of the Federal Constitution.

In their oral argument before us, appellants urged that correction of any supposed evils in employer-employee relations should be accomplished by union regulation, and that total prohibition of the type of contract forbidden by the statute is an excessive and arbitrary exercise of State police power.

The power of the General Assembly of Virginia to enact statutes is limited only by the provisions of the Federal Constitution and the restraints imposed by the Constitution of Virginia, and courts do not hold such enactments unconstitutional except when the violation is plain. *Reynolds* v. *Milk Comm., supra,* 163 Va. at p. 966, 179 S. E. at p. 510.

Within constitutional limitations the legislature may, in the exercise of the police power, restrict personal and property rights in the interest of public health, public safety, public morals, and for the promotion of the general welfare, and that power extends to so dealing with conditions which exist as to bring out of them the greatest welfare of the people by promoting public convenience and general prosperity. *Gorieb* v. *Fox,* 145 Va. 554, 134 S. E. 914, affirmed 274 U. S. 603, 47 S. Ct. 675, 71 L. ed. 1228, 53 A. L. R. 1210; *West Bros. Brick Co.* v. *Alexandria,* 169 Va. 271, 192 S. E. 881; *Wulfsohn* v. *Burden,* 241 N. Y. 288, 150 N. E. 120, 43 A. L. R. 651; *Mumpower* v. *Housing Authority,* 176 Va. 426, 11 S. E. (2d) 732; *Stickley* v. *Givens,* 176 Va. 548, 11 S. E. (2d) 631.

In *Nebbia* v. *New York,* 291 U. S. 502, 54 S. Ct. 505, 78 L. ed. 940, 89 A. L. R. 1469, it was said that neither property rights nor contract rights are absolute; for the government cannot exist if the citizen may at will use his property to the detriment of his fellows or exercise his freedom of

contract to work them harm; that the power to promote the general welfare is inherent in government; that the guaranty of due process demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It was further said in that case:

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.* * * * " 54 S. Ct. at p. 516, 89 A. L. R. at p. 1483.

"The Constitution does not speak of freedom of contract," said Mr. Chief Justice Hughes in *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 391, 392-3, 57 S. Ct. 578, 581, 582, 81 L. ed. 703, dealing with the State of Washington's minimum wage law for women. "It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process. * * *

"This power under the Constitution to restrict freedom of contract has had many illustrations. That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable. * * * " See

also, *Olsen* v. *Nebraska*, 313 U. S. 236, 61 S. Ct. 862, 865, 85 L. ed. 1305, 133 A. L. R. 1500; *Truax* v. *Corrigan*, 257 U. S. 312, 42 S. Ct. 124, 66 L. ed. 254, 27 A. L. R. 375.

"The right of the state," said Mr. Justice Frankfurter in *Carpenters and Joiners Union* v. *Ritter's Cafe*, 315 U. S. 722, 62 S. Ct. 807, 809, 86 L. ed. 1143, "to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted. * * * "

As pointed out in the state court decisions in *State* v. *Whitaker, supra,* and *Lincoln Federal Labor Union* v. *Northwestern Iron, etc., Co.,* 149 Neb. 507, 31 N. W. (2d) 477, recent federal legislation makes clear that Congress did not intend to interfere with the right of States to prohibit agreements requiring membership in a labor organization as a condition of employment. Sec. 14(b), Labor Management Relations Act, 1947, ch. 120, Public Laws, 80th Cong., 1st Sess., 61 U. S. Stat., part 1, at p. 151.

The North Carolina case, decided in December, 1947, refers to the fact that 15 States had then adopted laws prohibiting closed shops, and the Nebraska case, decided in March, 1948, refers to the fact that 18 States had then enacted similar legislation.

As said by the North Carolina court (45 S. E. (2d) at p. 871), "the composite will of such a broad cross section of our country cannot be lightly discarded as unreasonable, arbitrary or capricious or lacking in substantial relationship to its objective." See also, *American Federation of Labor* v. *American Sash, etc., Co.,* 67 Ariz. 20, 189 P. (2d) 912; *American Federation of Labor* v. *Watson,* 60 F. Supp. 1010 (reversed on jurisdictional grounds, 327 U. S. 582, 66 S. Ct. 761, 90 L. ed. 873).

" * * * The adoption of similar requirements by many states evidences a deepseated conviction both as to the presence of the evil and as to the means adapted to check it. Legislative response to that conviction cannot be regarded as arbitrary or capricious and that is all we have to decide.

Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment." *West Coast Hotel Co.* v. *Parrish, supra* (300 U. S. at p. 399, 57 S. Ct. at p. 585); *American Federation of Labor* v. *American Sash, etc., Co., supra* (69 S. Ct. at p. 259).

█ █ Very clearly there was reasonable basis for the legislative view that the conditions sought to be remedied by the Virginia statute could not be adequately remedied by mere regulatory provisions. There was evidence to be found in the acts of many States and of the Federal Congress to support the view that discrimination against employees because they did or did not belong to a union was against the public interest and should not be allowed. Laws merely regulating the union obviously would not accomplish that purpose. Basically, agreements involving such discrimination are hostile to our free enterprise system and to individual liberty of choice and action. Legislation that protects the citizen in his freedom to disagree and to decline an association which a majority would thrust upon him on the ground that it knows what is best for him, does no violence to the spirit of our fundamental law. The protection of minorities is the boast of our institutions and a basis of their asserted superiority over totalitarian regimes. The results have demonstrated the value of the democratic process.

As suggested by Mr. Justice Frankfurter in his concurring opinion in the Arizona, Nebraska and North Carolina cases (69 S. Ct. at p. 262), the General Assembly may well have been skeptical of an insistence upon the necessity to union security of power to compel, rather than to persuade, allegiance to a union of all who wanted to work. The genesis of the law could have been related to the warning of Mr. Justice Jackson in *West Virginia State Board of Education* v. *Barnette*, 319 U. S. 624, 63 S. Ct. 1178, 1187, 87 L. ed. 1628, 147 A. L. R. 674, 683: "Those who begin coercive elimination of dissent soon find themselves exterminating dis-

senters. Compulsory unification of opinion achieves only the unanimity of the graveyard."

We hold that the statute in question does not violate any constitutional limitation and the judgment of the lower court is accordingly

*Affirmed.*