PRESENT: Goodwyn, Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Millette, S.J.

HAZEL F. PALMER

v. Record No. 160630

OPINION BY
JUSTICE WILLIAM C. MIMS
July 13, 2017

ATLANTIC COAST PIPELINE, LLC

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Charles L. Ricketts, III, Judge

In this appeal, we consider whether a foreign corporation may exercise the entry-for-survey privilege given to natural gas companies by Code § 56-49.01. We also consider whether Code § 56-49.01 infringes upon provisions of the Constitution of Virginia.

I. Background and Procedural History

The Atlantic Coast Pipeline, LLC ("ACP") is a public service company organized under the laws of the State of Delaware. It is primarily "engaged in the underground storage and transportation of natural gas in interstate commerce." As such, it is a "natural gas company" as defined by 15 U.S.C. § 717a(6) and is subject to the jurisdiction of the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act, 15 U.S.C. § 717 *et seq.* ACP is engaged in FERC's regulatory approval process to build a natural gas transmission line that would extend from West Virginia to North Carolina, passing through the Commonwealth. As part of this process, ACP must conduct surveys, tests, appraisals, and other examinations upon properties located along the pipeline's proposed routes.

Hazel Palmer owns real property in the Commonwealth along a proposed route. On March 6, 2015, ACP sent Palmer a letter seeking permission to enter her property to conduct preliminary surveys. When Palmer withheld her consent, ACP provided a notice of intent to enter her property pursuant to Code § 56-49.01. The notice explained that Code § 56-49.01

"authorizes certain natural gas companies to enter upon property, without permission, for examinations, tests, hand auger borings, appraisals and surveys for proposed natural gas lines in order to satisfy regulatory requirements and to select the most advantageous route."

Palmer continued to deny ACP access to her property, and ACP filed a petition for a declaratory judgment in the circuit court requesting a declaration of its rights under Code § 56-49.01. Palmer filed a plea in bar, contending that Code § 56-49.01 only applies to domestic public service companies because it is within Title 56 of the Code of Virginia. She also demurred, arguing that Code § 56-49.01 is unconstitutional under Article I, § 11 of the Constitution of Virginia because it impermissibly burdens a fundamental right.

The circuit court overruled Palmer's plea in bar and demurrer. Regarding the plea in bar, it found that the applicability of Code § 56-49.01 "turns upon a definition borrowed from [11 U.S.C. § 717a] rather than an implied definition suggested by its placement within the Code of Virginia." Regarding the demurrer, the circuit court noted that the "legal challenges to the validity of [statutes like Code § 56-49.01 across the country] on the basis that they [e]ffect a taking without just compensation have been consistently rejected." (quoting *Charlottesville Division v. Dominion Transmission, Inc.*, 138 F.Supp.3d 673, 690 (W.D. Va. 2015)). Accordingly, it concluded that "[a] landowner has no constitutionally protected property right to exclude an authorized utility from entering his property for survey purposes." We granted Palmer this appeal.

## II. Analysis

### A. Applicability of Code § 56-49.01 to Foreign Corporations

Palmer contends that ACP cannot exercise the entry-for-survey power of Code § 56-49.01 for two reasons. First, she argues that a "natural reading" of the statute "dictates that [it]

2

only applies to Virginia public service companies." Second, she argues that the statute must be interpreted to avoid conflicting with Article IX, § 5 of the Constitution of Virginia. These arguments present "purely legal questions of statutory and constitutional interpretation which we review de novo." *L.F. v. Breit*, 285 Va. 163, 176, 736 S.E.2d 711, 718 (2013).

    1.  Unambiguous Language of Code § 56-49.01

In analyzing a statute, the Court's primary objective is "to ascertain and give effect to legislative intent." *Conger v. Barrett*, 280 Va. 627, 630, 702 S.E.2d 117, 118 (2010) (quoting *Turner v. Commonwealth*, 226 Va. 456, 459, 309 S.E.2d 337, 338 (1983)). "That intention is initially found in the words of the statute itself, and if those words are clear and unambiguous, we do not rely on rules of statutory construction." *Crown Cent. Petroleum Corp. v. Hill*, 254 Va. 88, 91, 488 S.E.2d 345, 346 (1997).

Code § 56-49.01 provides, in relevant part, that

> A. Any firm, corporation, company, or partnership, organized for the bona fide purpose of operating as a natural gas company as defined in 15 U.S.C. § 717a, as amended, may make such examinations, tests, hand auger borings, appraisals, and surveys for its proposed line or location of its works as are necessary (i) to satisfy any regulatory requirements and (ii) for the selection of the most advantageous location or route, . . . [and] may enter upon any property without the written permission of its owner . . . .

On appeal, Palmer argues that Code § 56-49.01 only applies to domestic natural gas companies because it is located within Title 56 of the Virginia Code, which governs "Public Service Companies." She suggests that if the statute was intended to apply to "any" natural gas company, "it would have been placed in Title 13.1, which governs '[c]orporations' generally."

This argument is not persuasive. Code § 56-49.01 provides its entry-for-survey power to "*[a]ny* . . . corporation [or] company . . . organized for the bona fide purposes of operating as a natural gas company as defined in 15 U.S.C. § 717a." *Id.* (emphasis added). For the purposes of

3

Title 56, the term "[c]orporation" or "company" includes not only corporations "created by acts of the General Assembly of Virginia, or under the general incorporation laws of this Commonwealth," but also "*all corporations . . . doing business therein.*" Code § 56-1 (emphases added). Thus, both domestic corporations and foreign corporations that are "doing business" within the Commonwealth – such as ACP – are included in the definition of "corporation" for the purposes of Title 56.

Next, Code § 56-49.01 applies to "[a]ny" such "corporation" that fits within 15 U.S.C. § 717a's definition of a "natural gas company." That is, the corporation must be "engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S.C. § 717a(6); *see also* 15 U.S.C. § 717a(1). Palmer does not contest that ACP fits within this definition. Accordingly, by its plain language, Code § 56-49.01 applies to foreign natural gas companies as defined by 15 U.S.C. § 717a(6) that do business in Virginia, including ACP.

2. Article IX, Section 5 of the Constitution of Virginia

Palmer next argues that we must deny the entry-for-survey privilege to foreign corporations to avoid conflicting with Article IX, § 5 of the Constitution of Virginia. This constitutional provision states, in relevant part, that "[n]o foreign corporation shall be authorized to carry on in this Commonwealth the business of, or to exercise any of the powers or functions of, a public service enterprise." Va. Const. art. IX, § 5. We cannot consider this argument because Palmer neither presented it to the circuit court nor raised it in her opening brief on appeal.

Rule 5:25 states that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling." This

4

rule "exists to protect the trial court from appeals based upon undisclosed grounds, to prevent the setting of traps on appeal, to enable the trial judge to rule intelligently, and to avoid unnecessary reversals and mistrials." *Reid v. Boyle*, 259 Va. 356, 372, 527 S.E.2d 137, 146 (2000) (quoting *Fisher v. Commonwealth*, 236 Va. 403, 414, 374 S.E.2d 46, 52 (1988)).

Palmer admitted at oral argument that she failed to present her Article IX, § 5 argument to the circuit court. As a result, there is no ruling on the issue, and we will not accept Palmer's invitation to reverse the circuit court's opinion based on this undisclosed ground. *McDonald v. Commonwealth*, 274 Va. 249, 255, 645 S.E.2d 918, 921 (2007) (refusing to consider a facial invalidity challenge to Code § 18.2-361(A) because the appellant never raised such a claim in the circuit court); *see also Jones v. Commonwealth*, 293 Va. 29, 39 n.5, 795 S.E.2d 705, 710 n.5 (2017) (The Court "will not consider an argument that differs from the specific argument presented to the trial court even if it relates to the same general issue." (citing *Floyd v. Commonwealth*, 219 Va. 575, 584, 249 S.E.2d 171, 176 (1978))).

Palmer also failed to raise the argument in her opening brief on appeal. Rule 5:27 states that "[t]he opening brief of the appellant . . . must contain . . . [t]he standard of review, the argument, and the authorities relating to each assignment of error." Rule 5:27(d). The failure to comply with this rule "results in waiver of the arguments the party failed to make." *John Crane, Inc. v. Hardick*, 283 Va. 358, 376, 722 S.E.2d 610, 620 (2012).

Regarding her first assignment of error, Palmer's opening brief argues, as discussed above, that the location of Code § 56-49.01 within the Code of Virginia prohibits foreign public service companies from utilizing its entry-for-survey power. In the last four lines of her argument relating to the placement of the statute within the Code, she quotes an excerpt from Article IX, § 5 and immediately concludes that the trial court erred by ruling "otherwise." Later,

5

for the first time in the course of this litigation, she presents extensive argument related to Article IX, § 5 in her reply brief.

At oral argument, Palmer's counsel admitted that he "didn't present [the argument in the opening brief] because [he] thought it was a silver bullet." He stated that he "referenced" the constitutional provision but "held back" the argument "to see what [ACP was] going to do with it" and then "went full blast in the reply [brief]." He took the position that referencing Article IX, § 5 in the opening brief was sufficient to preserve the issue. It is not.

Rule 5:27 requires an argument, and merely referencing a provision is not an argument. Accordingly, the argument is waived. *John Crane*, 283 Va. at 376, 722 S.E.2d at 620; *see also Whitley v. Commonwealth*, 223 Va. 66, 79 n.2, 286 S.E.2d 162, 170 n.2 (1982) ("[W]e will not notice a non-jurisdictional question raised for the first time in a reply brief filed in this Court.").

B. Article I, § 11 of the Constitution of Virginia

In her second assignment of error, Palmer contends that the trial court erred by overruling her demurrer because Code § 56-49.01 infringes upon her "fundamental right to private property in violation of Article I, § 11" of the Constitution of Virginia. Palmer's demurrer argued that Code § 56-49.01 violated Article I, § 11 by (1) authorizing "a taking or damaging of private property for private use," (2) authorizing "a taking or damaging of private property without just compensation," and (3) "impermissibly burden[ing] a fundamental right." However, her second assignment of error is restricted to the third claim of her demurrer. In fact, she expressly stated in her reply brief that she is not making a "takings" argument on appeal.[1]

---

[1] Palmer has thereby waived any argument relating to the trial court's rulings on the first two contentions of her demurrer – namely, that Code § 56-49.01 effects "a taking or damaging of private property for private use" and authorizes "a taking or damaging . . . without just compensation." Therefore, this opinion does not address the relationship between Code § 56-49.01 and the public use and just compensation requirements of the takings clause.

6

Palmer generally maintains that Article I, § 11 defines the right to private property as fundamental, and that Code § 56-49.01 unconstitutionally infringes upon her fundamental right to exclude ACP. In addressing this argument, we noted that "[t]here is no stronger presumption known to the law than that which is made by the courts with respect to the constitutionality of an act of Legislature." *Whitlock v. Hawkins*, 105 Va. 242, 248, 53 S.E. 401, 403 (1906); *In re Phillips*, 265 Va. 81, 85, 574 S.E.2d 270, 272 (2003) ("[A]ll acts of the General Assembly are presumed to be constitutional.").

1. Right to Exclude

In 2012, Article I, § 11 was amended to explicitly state that the right to private property is fundamental in Virginia. 2011 Acts ch. 757; 2012 Acts chs. 564, 684, 736, and 738. Palmer correctly notes that "[t]he right to exclude others is generally 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). Yet, the common law has long recognized that the right to exclude is not absolute. *See Kovacs v. Cooper*, 336 U.S. 77, 85 (1949) (plurality opinion) (observing that "even the fundamental rights of the Bill of Rights are not absolute").

The common law privilege to enter private property for limited purposes is outlined in the American Law Institute's first Restatement of Torts, published in 1934. Restatement of Torts §§ 191-211 (1934). Comment c of § 211 explains that this privilege applies "where an employee of a public utility is . . . authorized to enter upon privately owned land for the purpose of making surveys preliminary to instituting a proceeding for taking by eminent domain." *Id.* at § 211 cmt. c.

Today, every state has codified the common law privilege of a body exercising eminent domain authority to enter private property to conduct preliminary surveys without trespass liability.[2] Virginia statutory law has done so for 235 years. In 1782, a law permitted authorized surveyors to enter private land to survey the location of public roads and made it unlawful for anyone to "stop, oppose, or hinder" them. 1782 Acts ch. 51, *reprinted in* 11 William Waller Hening, *Statutes at Large* 27-28 (1823). The Code of 1819 gave a turnpike company "full power and authority to enter upon all lands and tenements through which they may judge it necessary to make said road; and to lay out the same according to their pleasure." 2 Va. Rev. Code ch. 234, § 7 (1819). The Code of 1860 gave "internal improvement" companies the authority to "enter upon any lands for the purpose of examining the same and surveying and laying out such as may

---

[2] Alabama, Ala. Code § 18-1A-50; Alaska, Alaska Stat. Ann. § 09.55.280; Arizona, Ariz. Rev. Stat. Ann. § 12-1115; Arkansas, Ark. Code Ann. § 18-15-1302; California, Cal. Civ. Proc. Code § 1245.010; Colorado, Colo. Rev. Stat. Ann. §§ 18-4-515 and 37-3-113; Connecticut, Conn. Gen. Stat. Ann. § 48-13; Delaware, Del. Code Ann. tit. 2 § 704; Florida, Fla. Stat. Ann. § 163.370; Georgia, Ga. Code Ann. § 22-3-86(c) and (d); Hawaii, Haw. Rev. Stat. § 101-8; Idaho, Idaho Code Ann. § 7-705; Illinois, 70 Ill. Comp. Stat. Ann. 5/22.3; Indiana, Ind. Code Ann. § 32-24-1-3; Iowa, Iowa Code Ann. § 314.9; Kansas, Kan. Stat. Ann. § 26-512; Kentucky, Ky. Rev. Stat. Ann. § 175B.050; Louisiana, La. Rev. Stat. Ann. § 48:217; Maine, Me. Rev. Stat. Ann. tit. 32 § 18231; Maryland, Md. Code Ann. Real Prop. § 12-111; Massachusetts, Mass. Gen. Laws Ann. ch. 164 § 72A; Michigan, Mich. Comp. Laws Ann. § 213.54; Minnesota, Minn. Stat. Ann. § 117.041; Mississippi, Miss. Code Ann. § 11-27-39; Missouri, Mo. Ann. Stat. § 99.420; Montana, Mont. Code Ann. § 70-30-110; Nebraska, Neb. Rev. Stat. Ann. § 15-229; Nevada, Nev. Rev. Stat. Ann. § 37.050; New Hampshire, N.H. Rev. Stat. Ann. § 371:2-a; New Jersey, N.J. Stat. Ann. § 20:3-16; New Mexico, N.M. Stat. Ann. § 42A-1-8; New York, N.Y. Em. Dom. Proc. Law § 404; North Carolina, N.C. Gen. Stat. Ann. § 40A-11; North Dakota, N.D. Cent. Code Ann. § 32-15-06; Ohio, Ohio Rev. Code Ann. § 163.03; Oklahoma, Okla. Stat. Ann. tit. 11 § 22-114; Oregon, Or. Rev. Stat. Ann. § 35.220; Pennsylvania, 26 Pa. Cons. Stat. Ann. § 309; Rhode Island, R.I. Gen. Laws Ann. § 24-12-9; South Carolina, S.C. Code Ann. § 28-2-70; South Dakota, S.D. Codified Laws § 49-33-6; Tennessee, Tenn. Code Ann. § 29-16-121; Texas, Tex. Nat. Res. Code Ann. § 111.019; Utah, Utah Code Ann. § 78B-6-506; Vermont, Vt. Stat. Ann. tit. 5, § 3518; Virginia, Code §§ 25.1-203, 56-49, and 56-49.01; Washington, Wash. Rev. Code Ann. § 47.01-170; West Virginia, W.Va. Code Ann. § 54-1-3; Wisconsin, Wis. Stat. Ann. § 182.38; Wyoming, Wyo. Stat. Ann. § 1-26-506.

seem fit to any officer or agent authorized by it, provided no injury be done to the owner or possessor of land." Va. Code tit. 17, ch. 56, § 4 (1860).

Most relevant to the present case, the Code of 1904 granted entry-for-survey authority to "[a]ny company" vested with eminent domain authority. Code § 1105f(3) (1904) (authorizing any company with power to condemn lands to "enter upon any lands . . . for the purpose of examining the same, and surveying"). Today, the Code contains three such statutes: Code §§ 56-49, 56-49.01, and 25.1-203. Code §§ 56-49 and 56-49.01 provide an entry-for-survey privilege specifically to "public service corporation[s]" and "natural gas compan[ies]." Code § 25.1-203(A) extends the same privilege to "any petitioner exercising" the power of eminent domain.

In sum, Palmer's right to exclude others is not absolute. The common law has long recognized the privilege of an entity exercising eminent domain power to enter private property to conduct surveys. This same privilege has a well-established historical pedigree in our statutory law. Accordingly, Palmer's right to exclude others from her property does not extend to ACP in the present case.

2. 2012 Amendment to Article I, § 11 of the Constitution of Virginia

Palmer does not rebut any of the above authorities. Rather, she argues that the 2012 amendment to Article I, § 11 of the Constitution of Virginia created a new constitutional right to exclude ACP from her property. We disagree.

The 2012 amendment to Article I, § 11 was "strongly influenced by the decision of the United States Supreme Court in the case of *Kelo v. New London*." 2012 Va. Op. Att'y Gen. 11-135, 2012 Va. AG LEXIS 3, at *8 (Jan. 26, 2012). In *Kelo*, the United States Supreme Court held that it was a valid "public use" to condemn non-blighted private land and transfer it to a private developer "to promote economic development" – specifically noting that doing so would

9

create "in excess of 1,000 jobs" and "increase tax and other revenues." *Kelo v. City of New London*, 545 U.S. 469, 472, 484 (2005).  Nevertheless, the majority noted that "nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power," and that "many States already impose 'public use' requirements that are stricter than the federal baseline." *Id.* at 489.

The 2012 amendment to Article I, § 11 accepted this invitation to place further restrictions on the takings power.  For example, Article I, § 11 now provides, in direct contradiction to the rationale employed by the United States Supreme Court in *Kelo*, that "a taking or damaging of private property is not for public use if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property." Va. Const. art. I, § 11.  The amendment also expanded the definition of "just compensation" to be "no less than the value of the property taken, lost profits and lost access, and damages to the residue caused by the taking." *Id*.

While the amendment also explicitly states that the right to "private property" is "fundamental," nowhere does the amended language purport to modify existing property rights. It certainly does not abrogate the extensive common law privileges catalogued by the Restatement and recognized in Virginia statutory law.  In other words, the amendment did not add any sticks to Palmer's bundle of property rights that did not already exist.  It primarily, in response to *Kelo*, limited the parameters within which eminent domain may be exercised to affect these rights and expanded the compensation to be paid.

10

III.  Conclusion

The unambiguous language of Code § 56-49.01 establishes the General Assembly's intent that the entry-for-survey privilege be available to foreign natural gas companies that do business within the Commonwealth.  Additionally, Palmer's fundamental property rights do not include the right to exclude ACP in the present case.  Accordingly, we affirm the circuit court's judgment.

*Affirmed.*


JUSTICE McCULLOUGH, concurring.

I concur in the majority opinion.  I write separately, however, to address a premise that underpins the appellant's argument, which is that the Due Process Clause of Article I § 11 of the Constitution of Virginia includes a "substantive" component.  Although our cases have *assumed* the existence of a substantive component to our Due Process Clause, *see, e.g.*, *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 97, 376 S.E.2d 525, 530 (1989), we have never undertaken the textual or historical inquiry necessary to determine whether, as a matter of original public meaning, our Due Process Clause contains a substantive component.  To the extent we have discussed substantive due process in any depth, it has always been in connection with case law from the United States Supreme Court and the Constitution of the United States. *See Walton v. Commonwealth*, 255 Va. 422, 427-28, 497 S.E.2d 869, 872-73 (1998); *Etheridge*, 237 Va. at 97-98, 376 S.E.2d at 529-30; *Duke v. County of Pulaski*, 219 Va. 428, 437-38, 247 S.E.2d 824, 829 (1978); *Board of Supervisors v. State Milk Comm'n*, 191 Va. 1, 8-9, 60 S.E.2d 35, 39 (1950); *Finney v. Hawkins*, 189 Va. 878, 886, 54 S.E.2d 872, 876 (1949); *Stickley v. Givens*, 176 Va. 548, 560, 11 S.E.2d 631, 637 (1940).

First, as a textual matter, our Due Process Clause provides no hint that it contains a substantive component.  The Due Process Clause has been part of our Bill of Rights since 1902, and it states in relevant part "[t]hat no person shall be deprived of his life, liberty, or property without due process of law."  Va. Const. art. I, § 11.  Its wording tracks the language of the Fifth Amendment and the Fourteenth Amendment.  Properly understood, these clauses have a straightforward meaning:  that if the state wishes to deprive a person of his life, liberty, or property, it must provide "due process of law," *i.e.*, procedural due process, which ordinarily includes, among other things, notice, and the opportunity to be heard before an impartial tribunal.  The Due Process Clause cannot fairly be read to include a substantive component that restrains arbitrary lawmaking.  From a textual perspective, "substantive" due process "is an oxymoron."  Steven G. Calabresi, Substantive Due Process after *Gonzales v. Carhart*, 106 Mich. L. Rev. 1517, 1531 (2008).  *See also* John Hart Ely, Democracy and Distrust:  A Theory of Judicial Review 186 (1980) ("[S]ubstantive due process is a contradiction in terms.").

Second, nothing in the extensive constitutional debates that resulted in the adoption of the Constitution of Virginia of 1902 suggests that its framers intended to include a substantive component to this clause.  One would expect to find a vigorous debate on the point, had the drafters of this provision intended such a radical and counter-textual reading of the Due Process Clause.  That debate is nowhere to be found.  More recently, in 1969, the Report of the Commission on Constitutional Revision recommended the addition of the words "life" and "liberty" to the protections for which due process should extend.  There is no mention of "substantive" due process. The Constitution of Virginia, Report of the Commission on Constitutional Revision 95-96 (1969).  It is therefore unlikely that the voting public had any

12

inkling that it was adopting a substantive component to due process when it ratified those drafts of the Constitution.

Third, whatever interpretation the United States Supreme Court has adopted for the Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution of the *United States* does not bind us in determining the meaning of the Due Process Clause of the Constitution of *Virginia*. Just as it remains the duty of the United States Supreme Court to interpret the text of the Constitution of the United States, our duty as the highest court in Virginia is to reach our own conclusion with respect to the meaning of Virginia's foundational charter of government.

Of course, we would be wise to consult persuasive precedent from other courts, including the United States Supreme Court, when those courts have construed textually similar or identical clauses. Substantive due process made its debut in the jurisprudence of the United States Supreme Court, infamously enough, in the *Dred Scott* case. Although it did not receive pride of place, it was offered as a rationale for the court's conclusion. *See Dred Scott v. Sandford*, 60 U.S. 393, 450 (1857). Following that decision, the concept of substantive due process lay dormant for a time, only to be revived during the *Lochner*[1] era as a device to strike down, albeit unevenly, reforms aimed at ameliorating what were often dismal working conditions (as well as, it must be conceded, special interest legislation designed to squelch competition). The Court ultimately disavowed this line of jurisprudence, *see, e.g., United States v. Carolene Products Co.*, 304 U.S. 144, 152 (1938), but not the idea of substantive due process. Having made its peace with economic legislation, shape-shifting substantive due process has now found new form as a device to invalidate a different kind of disfavored legislation, usually by slender majorities.

---

[1] *Lochner v. New York*, 198 U.S. 45, 53-54 (1905).

13

*See Lawrence v. Texas*, 539 U.S. 558 (2003); *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2584 (2015).

The United States Supreme Court has struggled to develop a rationale that would justify relying on substantive due process to strike down laws enacted by the people's elected representatives. In *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997), the Court attempted such a justification, holding that substantive due process protects fundamental rights "which are, objectively, deeply rooted in this Nation's history and tradition." In short order, however, the Court proceeded to side-step this limiting principle. *See, e.g.*, *Lawrence*, 539 U.S. 558; *Obergefell*, 576 U.S. ___, 135 S. Ct. 2584.

To summarize, then, the United States Supreme Court deployed substantive due process in *Dred Scott*, and came to regret it; relied on substantive due process anew in the *Lochner* era, and again came to regret it; and to the regret of a vocal minority of the Court, has once more deployed it in our time. If the absence of any textual or historical support for the concept were not enough to persuade me that we should not embrace substantive due process as part of Virginia's constitutional jurisprudence, a review of the United States Supreme Court's jurisprudence convinces me that we ought to leave "substantive" due process and its shabby and disorganized baggage train across the Potomac.

As Virginia's Supreme Court, we must uphold the Constitution of Virginia and the individual rights it protects. If, upon a careful inquiry, some of the clauses of our Declaration of Rights are found to offer more protection than the protections found in the Constitution of the United States, including the religious liberty and economic liberty rights devalued in modern

federal jurisprudence,[2] we should do our duty and honor the original public meaning of those provisions. Our exercise of the awesome but limited power of judicial review, however, should be undertaken without saddling the Constitution of Virginia with "substantive" due process.

---

[2] *See* Va. Const. art. I, § 1 (listing "the means of acquiring and possessing property" as an "inherent right"); Va. Const. art. I, § 16 ("[A]ll men are equally entitled to the free exercise of religion, according to the dictates of conscience.").